Francis v. Kings Park Manor, Inc.

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2015

(Argued: April 7, 2016
Final Submission: November 22, 2016
Decided: March 4, 2019)

Docket No. 15-1823-cv

_____

DONAHUE FRANCIS,

*Plaintiff-Appellant*,

v.

KINGS PARK MANOR, INC., CORRINE DOWNING,

*Defendants-Appellees*,

RAYMOND ENDRES,

*Defendant.*

_____

Before:

POOLER, LIVINGSTON, and LOHIER, *Circuit Judges*.

In this appeal, we consider whether a landlord may be liable under §§ 3604 and 3617 of the Fair Housing Act of 1968 ("FHA"), 42 U.S.C. §§ 3604, 3617, and analogous provisions of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, for failing to take prompt action to address a racially

hostile housing environment created by one tenant targeting another, where the landlord knew of the discriminatory conduct and had the power to correct it. The United States District Court for the Eastern District of New York (Spatt, *J.*) dismissed the claims of plaintiff Donahue Francis under the FHA, 42 U.S.C. §§ 1981 and 1982, and the NYSHRL, as well as Francis's other claims under New York State law. We **VACATE** the District Court's dismissal of the federal claims and the NYSHRL claims and **REMAND** for further proceedings. We **AFFIRM** the District Court's judgment in all other respects.

Judge Livingston dissents by separate opinion.

SASHA SAMBERG-CHAMPION (Yiyang Wu, John P. Relman, *on the brief*), Relman, Dane & Colfax PLLC, Washington, DC, *for Plaintiff-Appellant.*

MELISSA CORWIN (Stanley J. Somer, *on the brief*), Somer, Heller & Corwin LLP, Commack, NY, *for Defendants-Appellees.*

Vanita Gupta, Principal Deputy Assistant Attorney General, Jennifer Levin Eichhorn, Sharon McGowan, Thomas Chandler, United States Department of Justice, Civil Rights Division, Washington, DC; Tonya T. Robinson, Acting General Counsel, Michelle Aronowitz, Deputy General Counsel for Enforcement and Fair Housing, Kathleen Pennington, M. Casey Weissman-Vermeulen, Alexandria Lippincott, U.S. Department of Housing and Urban Development, Office of General Counsel, Washington, DC, *for Amicus Curiae* United States of America.

Susan Ann Silverstein, AARP Foundation Litigation, Washington, DC, *for Amicus Curiae* AARP.

LOHIER, *Circuit Judge*:

Just over fifty years ago, spurred by the assassination of Dr. Martin Luther King, Jr., Congress enacted Title VIII of the Civil Rights Act of 1968, commonly referred to as the Fair Housing Act of 1968 ("FHA" or "Act"), 42 U.S.C. § 3601 <u>et seq.</u>, a landmark piece of civil rights legislation that accompanied the Civil Rights Act of 1964 and the Voting Rights Act of 1965. The main question before us is whether a landlord may be liable under the FHA for failing to take prompt action to address a racially hostile housing environment created by one tenant targeting another, where the landlord knew of the discriminatory conduct and had the power to correct it. In holding that a landlord may be liable in those limited circumstances, we adhere to the FHA's broad language and remedial scope and agree with the views of the United States Department of Housing and Urban Development ("HUD"), the agency tasked with administering the FHA. We therefore vacate the judgment of the United States District Court for the Eastern District of New York (Spatt, <u>J.</u>) dismissing Donahue Francis's claims under the FHA and analogous New York State law, as well as his claims under 42 U.S.C.

§§ 1981 and 1982, and remand for further proceedings. As for Francis's challenges to the District Court's dismissal of his other claims, we affirm.

BACKGROUND

1. Facts

The allegations in Francis's complaint, which we assume to be true, see Morales v. City of New York, 752 F.3d 234, 236 (2d Cir. 2014), tell a story that remains too common today. "Having lived in inner city urban communities during earlier parts of his life," and "in search of a better housing situation," in 2010 Francis signed a rental lease agreement with defendant Kings Park Manor Inc. ("KPM").[1] He soon moved into an apartment unit of a complex owned by KPM and managed by co-defendant Corrine Downing (together with KPM, the "KPM Defendants"). After several uneventful months, Francis's next-door neighbor, Raymond Endres, began to subject Francis to what can only be described as a brazen and relentless campaign of racial harassment, abuse, and threats.

---

[1] Francis entered the lease agreement pursuant to the Housing Choice Voucher Program, 42 U.S.C. § 1437f(o), commonly known as the "Section 8" public housing program.

4

The specific allegations are as follows.  <u>See</u> Joint App'x 11–17.  In February 2012 Francis heard Endres say "Jews, fucking Jews," while standing in front of their apartments.[2]  Endres then called Francis, who is black, a "fucking nigger."[3]  On March 3, Endres approached Francis's open front door and said "damn fucking Jews," then looked at Francis and said "fucking asshole."  On March 10, Francis overheard Endres and another tenant discussing Francis "in derogatory terms."  The following day, Endres approached Francis's open front door and repeatedly called him a "nigger," then stated, "fucking nigger, close your god-darn door, fucking lazy, god-damn fucking nigger."  On March 20, Francis repeatedly called Francis a "nigger" in the parking lot of the apartment complex.  By this point, Francis understandably "felt afraid, anxious, and unwelcome."  On May 14, Endres yelled "fuck you" in front of Francis's front door; the following day, Endres approached Francis, who was leaving his apartment, and said, "keep your door closed you fucking nigger."  On May 22, Endres told Francis, "I oughta kill you, you fucking nigger."  On August 10, Endres called Francis a "fucking nigger" and a "black bastard."  Finally, on September 2, 2012, Endres

---

[2] Although Francis is apparently not Jewish, he alleges that some of his neighbors complained about Endres's anti-Semitic rants in the KPM complex.

[3] For a brief history of this odious word, see Randall Kennedy, Nigger: The Strange Career of a Troublesome Word (2002).

stood at Francis's open front door and photographed the interior of Francis's apartment.

From the start of Endres's several-month campaign of harassment, Francis, "fear[ing] for his personal safety," contacted the police and the KPM Defendants to complain. His first call to the police on March 11 prompted Suffolk County Police Hate Crimes Unit officers to visit the KPM apartment complex, interview witnesses, and warn Endres to stop threatening Francis with racial epithets. That day Francis also filed a police report, and a police officer told the KPM Defendants about Endres's conduct. The KPM Defendants did nothing.

In May 2012 Francis called the police again and filed another police report. This time, by letter dated May 23, 2012, Francis notified the KPM Defendants directly about Endres's racist conduct between March and May 2012. The letter "report[ed] . . . Endres for racial harassment, [and] for making racial slurs directly to [Francis]." It also provided contact information for the Suffolk County police officers responsible for investigating Endres. Again, the KPM Defendants failed to do anything at all, even as little as respond to Francis's letter.

Endres's conduct persisted. His escalating racial threats to Francis finally prodded the Suffolk County Police Department to arrest Endres for aggravated harassment in violation of New York Penal Law § 240.30. On August 10, 2012, Francis sent a second letter. It informed the KPM Defendants that Endres continued to direct racial slurs at Francis and "anti-semitic, derogatory slurs against Jewish people." It also disclosed that Endres had recently been arrested for harassment.

Endres's attempt to photograph Francis's apartment on September 2 was apparently the last straw. Francis contacted the police and the following day sent the KPM Defendants a third and final letter complaining about Endres's continued harassment. After receiving the letter, KPM advised Downing "not to get involved," and the KPM Defendants declined to respond or follow up. As a result, Endres remained a tenant at the apartment complex.

The complaint alleges that the KPM Defendants not only failed to investigate or attempt to resolve Francis's complaints of racial abuse but, to the contrary, allowed Endres to live at the complex through January 2013 without reprisal. That month, Endres's lease expired and he moved out of his apartment. A few months later, in April 2013, Endres pleaded guilty to harassment in

violation of New York Penal Law § 240.26(1). That same month, the State court entered an order of protection prohibiting him from contacting Francis.

2. Procedural History

In June 2014 Francis sued the KPM Defendants and Endres, claiming primarily that they violated §§ 3604 and 3617 of the FHA,[4] the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982, and that the KPM Defendants violated § 296(5) of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296(5), which bars housing discrimination in New York. Francis also sued the KPM Defendants and Endres for negligent infliction of emotional distress and for violating NYSHRL § 296(6) by aiding and abetting a violation of NYSHRL § 296(5), the KPM Defendants for breach of contract and breach of the implied warranty of habitability under New York State law, and Endres for intentional infliction of emotional distress. The District Court entered a default judgment against Endres, who never appeared. The KPM Defendants moved under Rule 12(b)(6) to dismiss the claims against them for failure to state a claim. The District Court granted that motion except as to Francis's implied warranty of

---

[4] Because Francis's complaint, the briefing presented to this Court, and the majority of the cases relied on in this opinion do so, we cite to the current codified version of the FHA contained in Title 42 of the United States Code, see 42 U.S.C. § 3601 et seq., rather than the numbered sections of the FHA itself as originally passed (§§ 804 and 818).

habitability claim, which Francis voluntarily withdrew and the District Court dismissed. The District Court then granted partial final judgment in favor of the KPM Defendants so that Francis could pursue this appeal, even though damages against Endres remained to be determined. See Fed. R. Civ. P. 54(b).

Following oral argument, we solicited HUD's views relating to a landlord's potential liability for a tenant's racial harassment of another tenant under its regulations. In response, HUD, as amicus curiae, points us to its rules designed to clarify the law in this area and urges us to recognize certain limited claims against landlords arising out of tenant-on-tenant racial harassment.

DISCUSSION

We focus on Francis's federal claims arising under §§ 3604 and 3617 of the FHA and under the Civil Rights Act of 1866, as well as his New York claims arising under NYSHRL § 296 and for negligent infliction of emotional distress. We review the District Court's dismissal of these claims de novo, accepting the factual allegations in the complaint as true. See Biro v. Condé Nast, 807 F.3d 541, 544 (2d Cir. 2015).

1.  Post-Acquisition Claims Under the Fair Housing Act

We start with the statutory text.  As relevant to this appeal, § 3604(b) of the Act makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(b).  Section 3617 of the Act also makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed" any right protected by the Act.  42 U.S.C. § 3617.  The language of the FHA has a "broad and inclusive compass," City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 731 (1995) (quotation marks omitted), and we therefore give it a "generous construction," Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 212 (1972).  Together, the Act's provisions are designed "to eliminate all traces of discrimination within the housing field."  Cabrera v. Jakabovitz, 24 F.3d 372, 390 (2d Cir. 1994) (quotation marks omitted).

We first address Francis's claims under §§ 3604(b) and 3617 with the text and those principles in mind.  As a threshold matter, we consider whether § 3604

prohibits discrimination occurring after a plaintiff buys or rents housing. We hold that so-called "post-acquisition" claims are cognizable under § 3604.[5]

Our view is rooted first in the language of the provision itself, which prohibits discrimination in the "terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith." 42 U.S.C. § 3604(b). As we describe somewhat more fully below, a number of our sister circuits have located in that text some degree of post-acquisition protection. We agree with the Seventh Circuit, for example, that the FHA's use of the terms "privileges" and "conditions" refers not just to the sale or rental itself, but to certain benefits or protections flowing from and following the sale or rental. See Bloch v. Frischholz, 587 F.3d 771, 779–80 (7th Cir. 2009) (en banc). And we agree with the analysis of the Ninth Circuit, for example, that "[t]he inclusion of the word 'privileges' implicates continuing rights," indicating that the "natural reading" of the statute "encompasses claims regarding services or facilities perceived to be wanting after the owner or tenant has acquired possession of the dwelling." Comm. Concerning Cmty. Improvement v. City of Modesto, 583 F.3d 690, 713 (9th Cir. 2009). In other words, we rely not only on the Supreme Court's

---

[5] Our dissenting colleague agrees that the FHA has "some post-acquisition application." Dissenting Op., post, at 8.

directive that we read the statute broadly, but also and more fundamentally on the statutory text itself.

In arriving at this interpretation, we note how closely § 3604(b)'s broad language tracks the language of Title VII, which, together with the FHA, forms part of the backbone of the coordinated congressional "scheme of federal civil rights laws enacted to end discrimination." Huntington Branch, N.A.A.C.P. v. Town of Huntington, 844 F.2d 926, 935 (2d Cir. 1988) ("The [FHA and Title VII] are part of a coordinated scheme of federal civil rights laws enacted to end discrimination . . . ."), superseded by regulation on other grounds, 24 C.F.R. § 100.500(c). Section 3604(b) of the FHA provides that "it shall be unlawful . . . [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b) (emphasis added). Title VII, enacted four years before the FHA, similarly provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1)

12

(emphasis added). Of course, the language in Title VII bans both pre- and post-hiring discrimination (including on-the-job racial harassment). See, e.g., Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014). Understanding that the analogy between the employer-employee relationship and the landlord-tenant relationship is imperfect and goes only so far, it nevertheless would be strange indeed if the nearly identical language of the FHA did not also impose liability for post-acquisition discrimination on landlords under certain circumstances. See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc., 135 S. Ct. 2507, 2516–19 (2015) (relying on interpretations of Title VII to interpret the FHA).

In recognizing post-acquisition hostile housing environment claims under the FHA, two of our sister circuits have likewise cited the linguistic overlap between Title VII and § 3604(b). See DiCenso v. Cisneros, 96 F.3d 1004, 1008 (7th Cir. 1996) ("[W]e recognize a hostile housing environment cause of action, and begin our analysis with the more familiar Title VII standard."); Honce v. Vigil, 1 F.3d 1085, 1088–90 (10th Cir. 1993) (citing Title VII caselaw to conclude that a hostile housing environment claim is actionable "when the offensive behavior unreasonably interferes with use and enjoyment of the premises" and is

13

"sufficiently severe or pervasive to alter the conditions of the housing arrangement" (quotation marks omitted)).  Similarly, in Neudecker v. Boisclair Corp., the Eighth Circuit relied on analogous language in the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., to conclude that post-acquisition "disability harassment" against a disabled tenant by other tenants "is actionable under the FHA."  351 F.3d 361, 364 (8th Cir. 2003).  There the tenant's suit against a property management company was permitted to proceed under the FHA after the tenant alleged that he was subjected to repeated disability-based harassment by fellow tenants, that he reported the harassment to the company "to no avail," and that the harassment interfered with his right to enjoy his home.  Id. at 365.

It is telling that on the issue of whether the FHA prohibits any type of post-acquisition discrimination, every other circuit faced with the issue has acknowledged that § 3604(b) at least prohibits "discrimination relating to . . . actual or constructive eviction," which is necessarily post-acquisition.  Cox v. City of Dallas, 430 F.3d 734, 746 (5th Cir. 2005); see Modesto, 583 F.3d at 714; Woodard v. Fanboy, L.L.C., 298 F.3d 1261, 1263–64, 1268 (11th Cir. 2002); Betsey v. Turtle Creek Assocs., 736 F.2d 983, 985–86 (4th Cir. 1984); see also Michigan

14

Prot. & Advocacy Serv., Inc. v. Babin, 18 F.3d 337, 347 (6th Cir. 1994). As the Seventh Circuit concluded, "in some circumstances homeowners have an FHA cause of action for discrimination that occurred after they moved in." Bloch, 587 F.3d at 772. In short, there is no circuit split on whether § 3604 reaches post-acquisition conduct. It does.

The only division, if one exists, relates to the scope or degree of the provision's reach. To answer that question we turn to § 3617, which, again, makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section . . . 3604." 42 U.S.C. § 3617. Section 3617 more comprehensively prohibits discriminatory conduct barred by § 3604(b) and creates an independent cause of action. Based on our reading of the text of that provision, we agree with the Seventh Circuit that "[c]oercion, intimidation, threats, or interference with or on account of a person's exercise of his or her [§ 3604(b)] rights can be distinct from outright violations of [§ 3604(b)]." Bloch, 587 F.3d at 782. "For instance, if a landlord rents to a white tenant but then threatens to evict him upon learning that he is married to a black

15

woman, the landlord has plainly violated § 3617, whether he actually evicts the tenant or not." Id.

We also note that HUD's regulations have for thirty years clearly contemplated claims based on post-acquisition conduct, consistent with our interpretation of §§ 3604 and 3617. In 1989, for example, HUD promulgated regulations that prohibited "[f]ailing or delaying maintenance or repairs of sale or rental dwellings because of race," 24 C.F.R. § 100.65(b)(2), or "[l]imiting the use of privileges, services or facilities associated with a dwelling because of race. . . of an owner [or] tenant," id. § 100.65(b)(4); see Bloch, 587 F.3d at 780–81; Modesto, 583 F.3d at 713–14; Implementation of the Fair Housing Amendments Act of 1988, 54 Fed. Reg. 3232, 3285 (Jan. 23, 1989). The direct reference to "tenants" in § 100.65(b)(4) provides particularly strong evidence that HUD has long considered the services provision of § 3604 to apply throughout a person's tenancy.

Finally, in our view, contrary interpretations of §§ 3604(b) and 3617 would contravene Congress's intent to root out discrimination in housing and to "replace the ghettos [with] truly integrated and balanced living patterns." Trafficante, 409 U.S. at 211 (quotation marks omitted). With the objective of

16

building a racially integrated society in mind, it would make no sense for Congress to require landlords to rent homes without regard to race but then permit them to harass tenants or turn a blind eye when tenants are harassed in their homes because of race.  See Babin, 18 F.3d at 347 (The FHA "encompasses such overt acts as racially-motivated firebombings . . . [or] sending threatening notes.").

For these reasons, we conclude that the FHA reaches conduct that, as here, "would constitute discrimination in the enjoyment of residence in a dwelling or in the provision of services associated with that dwelling" after acquisition.[6] Modesto, 583 F.3d at 714; see Wetzel v. Glen St. Andrew Living Cmty., LLC, 901 F.3d 856, 866–67 (7th Cir. 2018).

---

[6] Some scholarship on the subject confirms that § 3604(b) and § 3617 encompass post-acquisition claims.  See generally Robert G. Schwemm, Neighbor-on-Neighbor Harassment:  Does the Fair Housing Act Make a Federal Case out of It?, 61 Case W. Res. L. Rev. 865 (2011); Mary Pennisi, A Herculean Leap for the Hard Case of Post-Acquisition Claims:  Interpreting Fair Housing Act Section 3604(b) After Modesto, 37 Fordham Urb. L.J. 1083 (2010); Rigel C. Oliveri, Is Acquisition Everything?  Protecting the Rights of Occupants Under the Fair Housing Act, 43 Harv. C.R.-C.L. L. Rev. 1 (2008); Robert G. Schwemm, Cox, Halprin, and Discriminatory Municipal Services Under the Fair Housing Act, 41 Ind. L. Rev. 717 (2008).

## 2. The HUD Regulations and Tenant-on-Tenant Racial Harassment

Having concluded that the FHA encompasses post-acquisition claims, we next consider whether a landlord may ever be liable under the FHA for intentionally failing to address tenant-on-tenant racial discrimination. As our dissenting colleague accepts, Dissenting Op., post, at 18–19, the only other Circuit to grapple with the issue recently concluded that the FHA "creates liability against a landlord that has actual notice of tenant-on-tenant harassment based on a protected status, yet chooses not to take any reasonable steps within its control to stop that harassment." Wetzel, 901 F.3d at 859.

The KPM Defendants appear to argue that landlords are not liable under the FHA even for such intentional failures. But as the Seventh Circuit has recognized, the text of § 3617, which forbids "interfer[ence]" with a person's "exercise or enjoyment of" his or her rights under the FHA, encompasses landlord liability for a tenant's racially hostile conduct in some circumstances. See Wetzel, 901 F.3d at 859, 862–63.

Our dissenting colleague observes, see Dissenting Op., post, at 20, 29–30, that the text of the FHA nowhere explicitly endorses landlord liability for tenant-on-tenant harassment. True, but we have never required every last detail of a

18

legislative scheme to be spelled out in a statute itself—especially a civil rights statute. After all, the FHA also makes no explicit reference to liability for actual or constructive eviction, or for landlord-on-tenant intentional harassment, even though both forms of liability are widely recognized. See Wetzel, 901 F.3d at 862–63, 866–67. In any event, we have more than statutory text, legislative history, and a pattern of expansive readings of the FHA on which to draw in determining whether the statute prescribes landlord liability for tenant-on-tenant harassment. We also have HUD's interpretation of the FHA on the precise issue before us: In 2016 HUD published a final rule (the "Rule") amending its rules for discriminatory conduct under the FHA. See Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act, 81 Fed. Reg. 63,054 (Sept. 14, 2016) (codified at 24 C.F.R. pt. 100). The Rule, to which we accord "great" but by no means definitive weight, Trafficante, 409 U.S. at 210,[7] defines hostile environment harassment in

---

[7] Under the scheme described in Skidmore v. Swift & Co., 323 U.S. 134 (1944), we also accord deference to agency litigation interpretations when the agency, as here, appears as amicus. Serrichio v. Wachovia Sec. LLC, 658 F.3d 169, 178 (2d. Cir. 2011); Simsbury-Avon Pres. Soc'y, LLC v. Metacon Gun Club, Inc., 575 F.3d 199, 207 (2d Cir. 2009) ("[W]e will generally defer to an agency's interpretation of its own regulations, including one presented in an amicus brief, so long as the interpretation is not plainly erroneous or inconsistent with law."). We find HUD's interpretation here helpful and persuasive regardless of the level of deference.

19

violation of the FHA as referring to "unwelcome conduct that is sufficiently severe or pervasive as to interfere with: The availability, sale, rental, or use or enjoyment of a dwelling; the terms, conditions, or privileges of the sale or rental, or the provision or enjoyment of services or facilities in connection therewith; or the availability, terms, or conditions of a residential real estate-related transaction." 24 C.F.R. § 100.600(a)(2). As HUD explains in its amicus brief in this appeal, the Rule merely "formalizes HUD's longstanding view that, under the FHA, a housing provider may be held liable in certain circumstances for failing to address tenant-on-tenant harassment." HUD Amicus Br. 2.

The Rule, HUD's other implementing regulations for §§ 3604(b) and 3617, and the views expressed in its amicus brief only reinforce our textual interpretation, reflect the Act's broad scope and purpose, comport with the holdings of several of our sister circuits, and further persuade us that a landlord may be liable under the FHA for failing to intervene in tenant-on-tenant racial harassment of which it knew or reasonably should have known and had the power to address.

HUD's regulations, as clarified by the Rule, specifically provide that a landlord may be liable under the FHA for "[f]ailing to take prompt action to

20

correct and end a discriminatory housing practice by a third-party" tenant where the landlord "knew or should have known of the discriminatory conduct and had the power to correct it."[8] 24 C.F.R. § 100.7(a)(1)(iii). We distill from the Rule, and from HUD's own reading of it, three elements that a plaintiff "must prove . . . to establish a housing provider's liability for third-party harassment: (1) [t]he third-party created a hostile environment for the plaintiff . . . ; (2) the housing provider knew or should have known about the conduct creating the hostile environment;" and (3) notwithstanding its obligation under the FHA to do so, "the housing provider failed to take prompt action to correct and end the harassment while having the power to do so." Quid Pro Quo and Hostile Environment Harassment, 81 Fed. Reg. at 63,069.

The KPM Defendants conjure a parade of horribles that will result from the Rule, most prominently that the FHA will become a "vehicle for the

---

[8] The standard is also consistent with the Equal Employment Opportunity Commission's regulations under Title VII, which state that an employer may be liable for failing to address a hostile work environment that is created by a non-employee. See 29 C.F.R § 1604.11(e) ("An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action."); see also Inclusive Cmtys. Project, 135 S. Ct. at 2516–19 (turning to Title VII and the Age Discrimination in Employment Act of 1967 for "essential background and instruction" in an FHA case).

21

resolution of neighborhood disputes." Appellee's Br. 6. Their description is overblown. As mentioned above, and as relevant here, the Rule governs a landlord's obligation only in a discrete subset of disputes that involve discrimination "sufficiently severe or pervasive as to interfere with," among other things, the "use or enjoyment of a dwelling." 24 C.F.R. § 100.600(a)(2).

The KPM Defendants also argue that HUD's regulations rest on a fundamental misunderstanding of the landlord-tenant relationship. Unlike employer-employee relationships, they contend, no agency relationship exists between landlords and tenants, and landlords exert far less control over tenants than do employers over employees. We disagree with their argument. In devising 24 C.F.R. § 100.7(a), HUD demonstrated that it clearly understood the agency principles at issue in these relationships. A landlord may be liable under § 100.7(a)(1)(ii) only when it knows or should have known about the misconduct of an employee or agent but failed to intervene. Section 100.7(a)(1)(iii), on the other hand, imposes liability on a landlord for failing to intervene in the conduct of a third party only where an obligation to do so exists under the FHA,[9]

---

[9] We view it as uncontroversial that under some circumstances a landlord may be liable to a tenant for conditions occasioned by a third party that render the home uninhabitable or otherwise interfere with the tenant's permissible use of the leased

22

consistent with the statute's broad objective of eliminating discrimination in housing.

The KPM Defendants also argue that HUD's regulations fail to consider a landlord's variable levels of control over tenants. But 24 C.F.R. § 100.7(a)(1)(iii) contemplates degrees of landlord control, by providing that "[t]he power [of the landlord] to take prompt action to correct and end a discriminatory housing practice by a third-party depends upon the extent of the [landlord's] control or any other legal responsibility the [landlord] may have with respect to the conduct of such third-party." The Rule, in other words, clarifies that a landlord's ability to control a given tenant is relevant to determining the landlord's liability. This will be a fact-dependent inquiry. In some cases, a landlord may not have enough control over its tenants to be held liable for failing to intervene. In other cases, it will. Under the Rule, the landlord can be held liable only in circumstances where the landlord had the power to take corrective action yet

---

property. See Wetzel, 901 F.3d at 865 (noting that the obligation of a landlord to provide its tenants a residence free from "'interfer[ence] with a permissible use of the leased property by the tenant' . . . is breached even if a third party causes the interference, so long as the disturbance was 'performed on property in which the landlord has an interest' and the 'conduct could be legally controlled by [the landlord]'" (quoting Restatement (Second) of Property: Landlord & Tenant § 6.1 & cmt. d (Am. Law Inst. 1977))).

23

failed to do so. 81 Fed. Reg. at 63,070–71. But the landlord escapes liability under the FHA if the appropriate corrective action is "beyond the scope of its power to act."[10] Id. at 63,071.

In determining the scope of a landlord's power, courts will of course consider that housing providers ordinarily have a range of mechanisms at their disposal to correct discriminatory tenant-on-tenant harassment, such as "issuing and enforcing notices to quit, issuing threats of eviction and, if necessary, enforcing evictions," all of which are "powerful tools" that may be "available to a housing provider to control or remedy a tenant's illegal [discriminatory] conduct." Id.; see Wetzel, 901 F.3d at 865 ("Control in the absolute sense . . . is not required for liability. Liability attaches because a party has an arsenal of incentives and sanctions . . . that can be applied to affect conduct but fails to use

_____

[10] Whether the KPM Defendants had the "power to act" to take corrective action in this case (arising from, say, their authority to evict or some other authority) as a matter of federal common law or of State law is a question we leave to the District Court to consider on remand. But two further observations are appropriate. First, New York law appears to allow that a landlord may have a duty to prevent tenant-on-tenant attacks if "the landlord had ability or a reasonable opportunity to control [the aggressor]" and "the harm complained of was foreseeable." Firpi v. NYCHA, 573 N.Y.S.2d 704, 705 (2d Dep't 1991) (quotation marks omitted). Second, Francis's lease appears to authorize the KPM Defendants to bar a tenant's access to common areas, Joint App'x 51, as well as to evict a tenant who engages in criminal activity, "disturb[s] . . . neighbors," or represents "an actual and imminent threat to other tenants," Joint App'x 55–56.

24

them." (quotation marks omitted)).  In acknowledging that landlords have these remedial tools, we also recognize that the "duty . . . to furnish housing services in a nondiscriminatory manner to the tenants" "resides primarily with [the] landlord" and its agents—that is, "the owner or manager of the property." Clifton Terrace Assocs., Ltd. v. United Techs. Corp., 929 F.2d 714, 719–20 (D.C. Cir. 1991).  But before even addressing the landlord's power to act, we "ask[] whether [the management defendants] had actual knowledge of the severe harassment [the tenant] was enduring and whether they were deliberately indifferent to it."  Wetzel, 901 F.3d at 864.

The KPM Defendants and our dissenting colleague further submit that the Rule, as applied to this case, is impermissibly retroactive.  See Dissenting Op., post, at 36–37.  Although we would hold that Francis alleged a cognizable claim under the FHA even in the absence of the Rule,[11] we nevertheless conclude that the Rule is not retroactive but interpretive.  An interpretive rule, even one that grapples with a hard issue, "merely clarif[ies] an existing statute or regulation," and creates no new rights.  Sweet v. Sheahan, 235 F.3d 80, 91 (2d Cir. 2000)

---

[11] In other words, even if the Rule were retroactive, that would not present a problem here because we are applying the FHA itself (using the Rule as an aid in interpreting the FHA), not the Rule, to assess Francis's allegations in this case.

25

(quotation marks omitted). It "does not change the law, but [only] restates what the law according to the agency is and has always been: It is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand." Orr v. Hawk, 156 F.3d 651, 654 (6th Cir. 1998) (quotation marks omitted). By contrast, a legislative rule "change[s] the law" and "impose[s] a new duty, create[s] a new obligation, take[s] away a right or attache[s] a new disability to a past occurrence." Blake v. Carbone, 489 F.3d 88, 98 (2d Cir. 2007). As such, legislative rules are potentially retroactive but apply retroactively only in limited circumstances. See Sweet, 235 F.3d at 88–90.

In this case, the Rule promulgated by HUD purports on its face to be an interpretive rule. It "codifies HUD's longstanding view that a property owner . . . may be held liable for failing to take corrective action within its power in response to tenant-on-tenant harassment of which the owner knew or should have known." 81 Fed. Reg. at 63,070. The Rule "does not add any new forms of liability under the [FHA] or create obligations that do not otherwise exist." Id. at 63,068. HUD's amicus brief reinforces the interpretive nature of the Rule. For example, it asserts that the Rule merely "formalizes HUD's longstanding view that, under the FHA, a housing provider may be held liable in certain

26

circumstances for failing to address tenant-on-tenant harassment." HUD Amicus Br. 2. HUD also explains that the Rule "does not identify any new forms of liability under the FHA." Id. at 4. Having flatly rejected any notion of FHA liability premised on tenant-on-tenant harassment, the dissent understandably contests this explanation. But we see no compelling reason to doubt HUD's assertion that the Rule reflects a longstanding view held by the agency.

We accept, too, HUD's characterization of its own regulation as interpretive, as the Rule expresses the agency's view that the claim at issue in this case has long been cognizable under the FHA. See Huberman v. Perales, 884 F.2d 62, 68 (2d Cir. 1989) ("By declaring the implementing regulations interpretive, the [agency] expressed [its] judgment that . . . [its] regulations did not make . . . a change, retroactive or otherwise."). As discussed, federal courts have consistently considered hostile housing environments a violation of the FHA on its own terms. Because there was an adequate legislative basis for hostile housing environment claims under the FHA independently of the Rule, see Sweet, 235 F.3d at 91, and because HUD has never suggested a contrary position, we "afford more weight to the agency's . . . description" of it as interpretive. Mejia-Ruiz v. INS, 51 F.3d 358, 365 (2d Cir. 1995).

Lastly, in urging that we affirm the District Court's dismissal of Francis's FHA claims, the KPM Defendants argue that even if a hostile housing environment claim were cognizable under the FHA, Francis failed to allege that they intentionally discriminated against him. We have several problems with this argument. First, although both our dissenting colleague, see Dissenting Op., post, at 11–12, and the KPM Defendants contend that intentional discrimination is an element of an FHA violation, we have never gone quite that far. To the contrary, we have held that, "[t]o establish a violation of the FHA, a plaintiff need not show discriminatory intent but need only prove that the challenged practice has a discriminatory effect." Davis v. New York City Hous. Auth., 278 F.3d 64, 81 (2d Cir. 2002). This discriminatory "effects test" extends to "suits brought to redress discrimination against individual plaintiffs," Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1038 (2d Cir. 1979); see id. at 1036, including suits filed under § 3604(b), see United States v. Starrett City Assocs., 840 F.2d 1096, 1099–1101 (2d Cir. 1988). In recognizing such a test, we are joined by the Fifth Circuit, which has long held that a violation of § 3604(b) "may be established not only by proof of discriminatory intent, but also by a showing of

significant discriminatory effect." Simms v. First Gibraltar Bank, 83 F.3d 1546, 1555 (5th Cir. 1996).

Second, the KPM Defendants' argument misunderstands the difference between the harassing acts of a landlord or its agent and the harassing acts of a third party over which the landlord has a real measure of control. Take, for example, the somewhat analogous context involving a hostile work environment claim under Title VII. Faced with such a claim, we have not required a showing of direct intentional discrimination by the employer before imposing liability. Instead, we have premised an employer's liability on the employer's actual or constructive knowledge of the non-supervisory employee's harassment and the employer's subsequent failure to act. See Duch v. Jakubek, 588 F.3d 757, 765–66 (2d Cir. 2009). Insofar as the District Court required Francis to allege that the KPM Defendants' conduct was the result of direct, intentional racial discrimination, we conclude that this was error.

Finally, even assuming that such a requirement exists, we think that Francis's complaint, viewed in the light most favorable to Francis, plausibly and adequately alleges that the KPM Defendants engaged in intentional racial discrimination. Specifically, it alleges that the KPM Defendants "discriminat[ed]

against [Francis] by tolerating and/or facilitating a hostile environment," even though the defendants had authority to "counsel, discipline, or evict [Endres] due to his continued harassment of [Francis]," and also had "intervened against other tenants at Kings Park Manor regarding non-race-related violations of their leases or of the law." Joint App'x 19–20. In other words, Francis has alleged that the KPM Defendants had actual knowledge of Endres's criminal racial harassment of Francis but, because it involved race, intentionally allowed it to continue even though they had the power to end it. See Wetzel, 901 F.3d at 864. Accepting these allegations as true, the KPM Defendants "subjected [Francis] to conduct that the FHA forbids." Id. It may turn out that the KPM Defendants tried but failed to respond. Or it may unfold that they were powerless to evict or otherwise deal with Endres—in which case not even a discriminatory effects test could save Francis's case.[12] But Francis is entitled to discovery regarding at least the level of control the KPM Defendants actually exercised over tenants and whether they had the power to act to redress Endres's abuse.

---

[12] The KPM Defendants also argue that even if the Rule applies here, Francis has failed to establish that the alleged incidents between him and Endres were because of his race. Viewing the allegations in the complaint in the light most favorable to Francis, it is hard for us to see how this could be so, but in any event we leave that question to be resolved by the District Court on remand with the benefit of both HUD's Rule and this opinion.

For these reasons, we vacate the District Court's dismissal of Francis's

FHA claims and remand for further proceedings relating to those claims.

### 3. The Civil Rights Act of 1866

The District Court dismissed Francis's claims under the Civil Rights Act of

1866, 42 U.S.C. §§ 1981 and 1982, because he failed to allege that the KPM

Defendants acted with racial animus, rather than deliberate indifference. In an

action under §§ 1981 or 1982, a plaintiff must allege three elements: First, that the

plaintiff is a member of a racial minority; second, that the defendant intended to

discriminate based on the plaintiff's race; and third, that the discrimination

concerned one of the enumerated statutory activities (here, to make and enforce

contracts (§ 1981) and to lease property (§ 1982)). Mian v. Donaldson, Lufkin &

Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993). In this case, only the second

factor is in dispute. The KPM Defendants maintain that Francis needed to allege

that they intended to discriminate on the basis of race, while Francis claims that

it is enough to allege their deliberate indifference to Endres's discriminatory

conduct. We agree with Francis. A defendant's deliberate indifference to racial

31

discrimination can violate § 1981,[13] so long as the indifference "was such that the defendant intended the discrimination to occur." Gant ex rel. Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 141 (2d Cir. 1999). As we explained in connection with Francis's FHA claim, Francis has plausibly and adequately alleged that the KPM Defendants acted with at least deliberate indifference that facilitated Endres's racial harassment. We therefore vacate the District Court's dismissal of Francis's §§ 1981 and 1982 claims and remand for further proceedings relating to those claims.

### 4. State Law Claims

Finally, Francis challenges the District Court's dismissal of his claims under NYSHRL §§ 296(5) and 296(6), as well as its dismissal of his claim for negligent infliction of emotional distress under New York State law. We address each challenge in turn.

#### a. New York Executive Law

Section 296(5) of the NYSHRL, like the FHA, prohibits housing discrimination and provides in relevant part: "It shall be an unlawful

---

[13] Although we have not previously addressed the issue, we see no reason to distinguish § 1981 from § 1982 in this regard. We therefore hold that a defendant's deliberate indifference to racial discrimination can also violate § 1982 under similar circumstances.

32

discriminatory practice for the owner, lessee, sub-lessee, assignee, or managing agent . . . [t]o discriminate against any person because of race . . . in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or in the furnishing of facilities or services in connection therewith."  N.Y. Exec. Law § 296(5)(a)(2); see also id. § 296(6) (prohibiting aiding and abetting "any of the acts forbidden under this article").  Stating a housing discrimination claim under New York State law is substantially similar to stating a housing discrimination claim under the FHA.  See Stalker v. Stewart Tenants Corp., 940 N.Y.S.2d 600, 602–03 (1st Dep't 2012) (noting the "substantial identity between the language and purposes of Executive Law § 296(5) and those of the federal Fair Housing Act").  Indeed, "[c]laims under the FHA and [§] 296 are evaluated under the same framework."  Olsen v. Stark Homes, Inc., 759 F.3d 140, 153 (2d Cir. 2014) (quotation marks omitted).  The District Court understood this point, concluding that Francis's "claim under [§] 296(6) fail[ed] as a matter of law" for the same reasons that his FHA claims failed.  Francis v. Kings Park Manor, Inc., 91 F. Supp. 3d 420, 434 (E.D.N.Y. 2015).

Because we conclude that the FHA must proceed rather than fail, we vacate the District Court's dismissal of Francis's claims under § 296 and remand for further proceedings.

### b. Negligent Infliction of Emotional Distress

The District Court dismissed Francis's claim on the ground that a landlord owes no common law duty of care to prevent one tenant from harassing another tenant. But as we explained above, the KPM Defendants may have had a duty arising from the FHA itself. Nevertheless, we affirm for the separate reason that any injury for negligent infliction of emotional distress "is compensable only when [it is] a direct, rather than a consequential, result of the breach" of a duty that a defendant owes to a plaintiff.[14] Kennedy v. McKesson Co., 58 N.Y.2d 500, 506 (1983). Here, as alleged in the complaint and when viewed in the light most favorable to Francis, the KPM Defendants' breach of the duty they may have owed Francis did not directly result in Francis's emotional distress, which Endres directly caused with his continued campaign of racial harassment.

---

[14] Under New York law, a claim for negligent infliction of emotional distress requires at least a causal connection between the conduct and the injury. See Mortise v. United States, 102 F.3d 693, 696 (2d Cir. 1996); Jason v. Krey, 875 N.Y.S.2d 194, 195 (2d Dep't 2009)

34

We have considered the parties' remaining arguments and conclude that they are either without merit or, as with the KPM Defendants' arguments based on the First, Fourth, and Fourteenth Amendments, forfeited. For the reasons set forth above, we **VACATE** the District Court's dismissal of Francis's claims under the FHA, §§ 1981 and 1982, and NYSHRL § 296, and **REMAND** for further proceedings consistent with this opinion. We **AFFIRM** the District Court's judgment in all other respects.

DEBRA ANN LIVINGSTON, *Circuit Judge*, dissenting:

This complaint involves the resident of a New York apartment complex who allegedly subjected his neighbor to racially motivated harassment on about a dozen occasions before moving away when the landlord declined to renew his lease. But the case is not about the heinous conduct of horrible neighbors, nor whether to condone it. Instead, the question here is whether this Court properly construes Title VIII of the Civil Rights Act of 1968, referred to as the Fair Housing Act (the "FHA"), to impose a duty on *landlords* to monitor and remediate the behavior of one's neighbors, on pain of incurring liability for damages and litigation costs, including attorney's fees. The majority does not properly construe the FHA to impose such third-party liability for the conduct of neighbors. Instead, it steers the FHA into "unchartered territory," *see Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 864 (7th Cir. 2018), where courts improbably discover new causes of action in half-century-old provisions, and heedless of the deleterious consequences for parties, courts, and the housing market.

The majority justifies its novel and expansive theory of landlord liability for tenant-on-tenant harassment by invoking the "broad language" of the FHA. But I can find no support for the majority's decision in the FHA's text, our precedent, or

1

the background tort principles that informed Congress at the time the FHA was enacted. Accordingly, I respectfully dissent.

## I

### 1. *Textual Analysis*

Although the trajectory of its analysis somewhat obscures the breadth of its holding, the majority today tackles the question whether the FHA imposes liability on landlords for "failing to take prompt action to address a racially hostile housing environment created by one tenant targeting another," regardless of the landlord's lack of discriminatory intent. Maj. Op. at 3. In concluding that the FHA *does* impose such liability, the majority purports to "start with the statutory text." Maj. Op. at 10. But make no mistake. This is textual analysis in name only, performed en route to fashioning a new cause of action from a fundamentally flawed analogy to Title VII and from "great," Maj. Op. at 19, if unjustified, deference to pronouncements by the Department of Housing and Urban Development ("HUD") in connection with a rule that HUD promulgated *after* this litigation began.[1] The majority acknowledges that the FHA "nowhere explicitly endorses

---

[1] Notably, HUD's new rule, Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act, 81 Fed. Reg. 63,054, 63,069 (Sept. 14, 2016) ("HUD Rule"), which is discussed herein, has been

landlord liability for tenant-on-tenant harassment," but is unconcerned by this lack of statutory support because "we have never required every last detail of a legislative scheme to be spelled out in a statute itself." Maj. Op. at 18–19. Respectfully, however, the FHA specifies *nothing* as to the elements of the cause of action recognized today. And the provisions on which the majority *does* rely are most reasonably read to exclude it.

Two provisions of the FHA are at issue here. Section 3604(b) makes it unlawful "to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). Section 3617 makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by [§ 3604]." *Id.* at § 3617. At the start, and on the face of each provision, the statutory language requires a plaintiff to prove discrimination or related conduct *by the defendant* and would not appear to impose an ongoing duty to *prevent* discrimination by others. Thus, typical violations of

---

considered by only one other circuit court, which deemed it insufficiently supported by reasoned analysis to permit any reliance on it. *See Wetzel*, 901 F.3d at 866.

3

§ 3604(b) by landlords have included such matters as "showing a member of a protected class fewer apartments, quoting higher rents," and "requiring [unnecessary] applications and credit checks." *Francis v. Kings Park Manor, Inc.*, 91 F. Supp. 3d 420, 432 (E.D.N.Y. 2015) (quoting *Fair Hous. Justice Ctr. v. Broadway Crescent Realty, Inc.*, No. 10 Civ. 34 (CM), 2011 WL 856095, at *6 (S.D.N.Y. Mar. 9, 2011)). A recent claim brought under § 3617 in this Circuit included allegations that a defendant-landlord refused to offer basic services to his tenants and locked them out of their apartment because of their race. *See Khodeir v. Sayyed*, No. 15-cv-8763 (DAB), 2016 WL 5817003, at *1–2, 4 (S.D.N.Y. Sept. 28, 2016). As the majority concedes, neither provision facially contemplates liability for failing to redress tenant-on-tenant harassment. *See* Maj. Op. at 18.

Indeed, even to reach the question before us today, the majority must first resolve an antecedent question long left unanswered in this Circuit: namely, whether § 3604(b) reaches *any* conduct occurring after the initial sale or rental of a residence, let alone a landlord's alleged failure to prevent or remediate the conduct of tenants commencing years after a plaintiff's lease was signed. *See Francis*, 91 F. Supp. 3d at 424 (noting that the plaintiff first heard his neighbor using racial and ethnic slurs almost two years into the leasehold).

4

Again at the start, and as Judge Posner noted some years ago when analyzing the provisions at issue here, "[t]he Fair Housing Act contains no hint either in its language or its legislative history of a concern with anything but *access* to housing." *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 329 (7th Cir. 2004). Because the FHA's central focus was "the widespread practice" in 1968 "of refusing to sell or rent homes in desirable residential areas to members of minority groups," post-acquisition problems including "*harassing . . . neighbors*" would "tend not to arise until the Act was enacted and enforced." *Id.* at 328–29 (emphasis added). Unsurprisingly, then, nothing in the FHA "suggest[s] that Congress was trying to solve that future problem, an endeavor that would have required careful drafting in order to make sure that quarrels between neighbors did not become a routine basis for federal litigation." *Id.* at 329.

The majority reassures that "there is no circuit split on whether § 3604 reaches post-acquisition conduct." Maj. Op. at 15. In doing so, however, the majority obfuscates the deep division that *does* exist as to "the *scope or degree* of the provision's [post-acquisition] reach." Maj. Op. at 15 (emphasis added). Judge Posner himself allowed that § 3604(b) "might be stretched far enough [in the post-acquisition context] to reach a case of 'constructive eviction.'" *Halprin*, 388 F.3d at

5

329.[2] The majority, however, goes much further, aligning itself with the Ninth Circuit's position that the FHA reaches any "conduct," including a defendant's *failure* to act, "that . . . 'constitute[s] discrimination in the enjoyment of residence in a dwelling or in the provision of services associated with that dwelling' after acquisition." Maj. Op. at 17 (quoting *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 714 (9th Cir. 2009)). In other words, § 3604(b), in the majority's articulation, provides "a blanket 'privilege' to be free from all discrimination from any source" when such discrimination affects residential enjoyment. *Bloch v. Frischholz*, 587 F.3d 771, 780 (7th Cir. 2009) (rejecting any such "blanket privilege"). But on analysis, this is simply not a reasonable interpretation of the provision's reach.

By way of reminder, § 3604(b) makes it unlawful to discriminate "in the terms, conditions, or privileges of sale or rental of a dwelling." As the majority notes, this language partially "tracks the language of Title VII." Maj. Op. at 12. But unlike Title VII, which provides a cause of action against specified *employers*

---

[2] The Fifth Circuit cited the example of one such claim in *Cox v. City of Dallas*, 430 F.3d 734 (5th Cir. 2005), noting that if a landlord "refused to continue renting to a tenant because the tenant entertained black guests," such conduct, amounting to a constructive eviction, would constitute discrimination in the "terms, conditions, or privileges of . . . rental," cognizable under § 3604(b), *id.* at 746–47 (discussing *Woods-Drake v. Lundy*, 667 F.2d 1198 (5th Cir. 1982)).

who discriminate, the FHA does not identify a class of potential defendants who can be charged—so that not only landlords, but also public housing authorities, cooperative boards, block associations, real estate agents, or, indeed, *anyone*, is potentially liable.

With this limitless list of potential defendants in mind, the full import of the majority's approach becomes clear. Agreeing with the Ninth Circuit, the majority construes the phrase "privileges of sale or rental" in § 3604(b) to encompass claims regarding *any* "'services or facilities perceived to be wanting after the owner or tenant has acquired possession of the dwelling'"—regardless whether such services or facilities have any connection with the rental or sale. Maj. Op. at 11 (quoting *Modesto*, 583 F.3d at 713). In *Modesto*, on which the majority relies, this approach produced the holding that a plaintiff may pursue a § 3604(b) claim alleging discrimination by a local government in the provision of law enforcement protection to homeowners or renters, notwithstanding the lack of any connection to a residence's sale or lease. *See Modesto*, 583 F.3d at 713–15.

But § 3604(b) simply does not have the vague and expansive scope that the majority's (and the Ninth Circuit's) interpretation affords it. The FHA expressly defines "to rent" as "to lease, to sublease, to let and otherwise to grant for a

7

consideration the right to occupy the premises not owned by the occupant." 42 U.S.C. § 3602(e). Section 3604(b)'s prohibition on discrimination in the "terms, conditions, or privileges of . . . rental" is thus most reasonably read to refer to discrimination in the terms, conditions, and privileges of the *rental arrangement*—a construction that has *some* post-acquisition application, but that still ties potential liability to discrimination regarding the commitments made and benefits afforded in connection with the rental itself.

To be clear, § 3604(b) prohibits discrimination in the "terms, conditions, or privileges of sale or rental of a dwelling, *or* in the provision of services or facilities in connection therewith . . . ." (emphasis added). But this doesn't change the analysis. The Fifth Circuit has recognized as much, holding that the prohibition on discrimination in "the provision of services or facilities in connection therewith" applies specifically to "*the sale or rental* of [the] dwelling," rather than to the dwelling generally. *Cox v. City of Dallas*, 430 F.3d 734, 745 (5th Cir. 2005) (emphasis added) (holding that municipality's alleged failure to prevent dumping near the plaintiffs' homes was *not* actionable under § 3604(b) because the allegedly discriminatory enforcement of zoning laws was not "connected" to the sale or rental of the dwelling). The Fifth Circuit directly addressed § 3604(b)'s text, noting

8

that its interpretation of the language was "grammatically superior" in requiring a relationship between the services or facilities at issue and a sale or rental. *Id.*

The majority fails to recognize that the same limiting principle holds true for the word "privileges" in § 3604(b)'s prohibition against discrimination in the "terms, conditions, or privileges of sale or rental." The majority "agree[s] with the analysis of the Ninth Circuit" that "privileges" connotes "continuing rights," so as to encompass post-acquisition claims "regarding services or facilities perceived to be wanting after the owner or tenant has acquired possession of the dwelling." Maj. Op. at 11 (quoting *Modesto*, 583 F.3d at 713). But "privileges of sale or rental," like "terms and conditions," requires a connection with the sale or rental, so that not *all* impairments of a person's post-acquisition enjoyment of residence are sufficiently connected to the sale or rental to trigger § 3604(b). As the Fifth Circuit explained in requiring such a connection, the argument to the contrary, based solely on reading the word "privileges" in isolation from the statute as a whole, is notably "unconvincing." *Cox*, 430 F.3d at 745 n.32.[3]

---

[3] Judge Higginbotham, the author of *Cox*, also noted that the approach to § 3604(b)'s interpretation endorsed by the majority today would appear to have the unlikely effect of affording a § 3604(b) cause of action for alleged discrimination by any party, so long as it could be said to "impact[ ] property values." *Cox*, 430 F.3d at 746. But as he suggested, that broad reach cannot reasonably be ascribed to this provision.

The majority evades this textually required connection for a simple reason: the complaint here contains not a word to suggest that Kings Park Manor, Inc., the landlord in this case, undertook any obligation in its rental arrangement with Donahue Francis, the tenant, for monitoring the conduct of other tenants and remediating their behavior. This is not a usual "term, condition, or privilege" of a lease. But after today, that no longer matters. The majority joins the Ninth Circuit in eliminating any required connection between the "terms, conditions, or privileges of sale or rental" and the sale or rental itself, placing this Court on the wrong side of the significant circuit split as to § 3604's post-acquisition reach.

Nor do the majority's textual problems end with § 3604(b). Turning our attention to § 3617, I gather that it is the majority's position that a landlord's failure to redress tenant-on-tenant harassment qualifies as an "interference" with the enjoyment of a "right . . . protected by" § 3604(b).[4] Even assuming that § 3604(b) were otherwise applicable (and it is not), the majority's position constitutes an untenable interpretation of the word "interfere," which contemporaneous

---

[4] By way of reminder, § 3617 provides in relevant part that it is unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section . . . 3604."

10

dictionaries define as "to check, hamper; hinder; disturb; intervene; intermeddle; interpose; to enter into or take part in, the concerns of others." *Black's Law Dictionary* 951 (4th ed. 1968); *see also Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 113 (3d Cir. 2017) (defining "interfering" for the purposes of § 3617 as "the act of meddling in or hampering an activity or process" (quoting *Walker v. City of Lakewood*, 272 F.3d 1114, 1129 (9th Cir. 2001) (quoting *Webster's Third New Int'l Dictionary* 1178 (14th ed. 1961)))). Indeed, one would think that § 3617's *prohibition* on intimidation, coercion, and other inappropriate intermeddling in others' enjoyment of rights protected by § 3604 is a particularly unlikely place to look for a *duty to intervene* to address one tenant's harassment by another.

Finally, I disagree with the majority's evisceration of any discriminatory intent requirement from these provisions of the FHA. *See* Maj. Op. at 29 ("Insofar as the District Court required Francis to allege that the KPM Defendants' conduct was the result of direct, intentional racial discrimination, we conclude that this was error."). As the court below noted, "fairly read, the text of both Section 3604(b) and Section 3617 of the FHA . . . require intentional discrimination on the part of a Defendant." *Francis*, 91 F. Supp. 3d at 433. Section 3604(b) prohibits "discriminat[ion] . . . *because of*" a protected characteristic. (emphasis added). As

11

the Supreme Court has consistently reminded us, a person acts "because of" something if that something "was the 'reason' that the [person] decided to act." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013); *see also Alexander v. Sandoval*, 532 U.S. 275, 278–80 (2001) (holding that it was "beyond dispute" that statute banning discrimination "on the ground of race" prohibited "only intentional discrimination"). Similarly, § 3617, making it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any right granted [under the FHA]," demands a showing that "the defendant[] coerced, threatened, intimidated, or interfered with the plaintiff *on account* of her protected activity under the FHA." *Bloch*, 587 F.3d at 783 (emphasis added).

The majority decides to the contrary, but it can do so only by ignoring this clear statutory text and all or part of past decisions of this Court and others. *See, e.g.*, *Austin v. Town of Farmington*, 826 F.3d 622, 630 (2d Cir. 2016) (noting that a retaliation claim brought under § 3617 requires "a showing of a particular state of mind, *i.e.*, a retaliatory motive"); *Wetzel*, 901 F.3d at 868 (reaffirming that an interference claim brought under § 3617 requires a showing of intentional discrimination); *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 613 (6th Cir. 2012)

12

("In this Circuit, a plaintiff is required to demonstrate 'discriminatory animus' to prevail on an interference claim under [§ 3617 of] the Act."); *Sofarelli v. Pinellas Cty.*, 931 F.2d 718, 723 (11th Cir. 1991) (holding that to recover under §§ 3604(b) and 3617 a plaintiff "must establish that" the defendant "acted with racial animus").[5] Moreover, the smattering of Second Circuit cases on which the majority *does* rely predates the Supreme Court's recent and significant decision on this subject in *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015) ("*ICP*"), and is accordingly of limited precedential value (to whatever degree it can even be said to support the majority's position).[6]

---

[5] *See also Eureka V LLC v. Town of Ridgefield*, No. 3:02CV00356 (DJS), 2011 WL 13228231, at *15 (D. Conn. Feb. 4, 2011) ("Eureka's § 3617 claim fails because Eureka is unable to show one of the critical elements of such a claim: discriminatory intent."), *aff'd*, 535 F. App'x 41 (2d Cir. 2013).

[6] HUD purports to rely on *ICP* itself to support its argument that "[a] plaintiff does not need to prove a landlord's discriminatory intent or motive to establish liability under the FHA for failing to intervene in tenant-on-tenant racial harassment." HUD Amicus Br. 14–15. But the majority wisely avoids HUD's argument to this effect because *ICP* instead demands that circuits *reevaluate* their jurisprudence cognizing disparate impact claims under the FHA. *ICP* holds that § 3604(*a*) (not (b)) permits disparate impact claims. Notably, however, the Court based this conclusion on the "otherwise make unavailable" language of that subsection—language "of central importance" not to be found in §§ 3604(b) and 3617. *ICP*, 135 S. Ct. at 2518.

Perhaps recognizing the precariousness of that position, the majority asserts, finally, that even assuming a requirement of intentional discrimination, Francis has, in any event, adequately alleged that the KPM Defendants engaged in intentional racial discrimination. Maj. Op. at 29. This is a startling conclusion, for Francis himself does not argue that the KPM Defendants are liable because they acted with racial animus, but instead argues principally that this Court should impose liability under the FHA for the "*negligent* failure to remedy a discriminatory [housing] environment." Br. Pl-Appellant at 14 (emphasis added).[7] Left to its own devices to find in the complaint a plausible basis for inferring intentional discrimination, the majority latches onto Francis's conclusory statement that the KPM Defendants "have intervened against other tenants at Kings Park Manor regarding non-race-related violations of their leases or of the law." Joint App'x at 20. But this amounts to the claim that because the KPM Defendants did *something* with regard to *some* incident involving *some* tenant at *some* past point, the alleged failure to intervene here must have been based on racial animus. Despite the majority's valiant efforts, this "naked assertion" cannot

---

[7] Thus, as to the preceding paragraphs, even if the majority were correct that disparate impact claims are available under §§ 3604(b) and 3617, this would still not save Francis's suit because he brings a disparate treatment claim, not one of disparate impact. *See ICP*, 135 S. Ct. at 2513 (contrasting the two theories of liability).

14

plausibly support an inference of discriminatory intent. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676–78 (2007) (noting that a complaint fails to state a claim "if it tenders naked assertion[s] devoid of further factual enhancement," and that pleading "purposeful discrimination requires more than . . . intent as awareness of consequences" (internal quotation marks omitted)).

In essence, the majority's statutory analysis is not textual at all, but floats on the statute's "broad and inclusive compass," Maj. Op. at 10 (quoting *City of Edmonds v. Oxford House*, 514 U.S. 725, 731 (1995)), as supplemented by an analogy to Title VII and by deference to the aforementioned HUD Rule. The Title VII analogy and the HUD Rule are dealt with below. As for the FHA's broad purpose, recognition of a statute's purpose, however salutary, does not give us a "roving license . . . to disregard clear language simply on the view that . . . Congress must have intended something broader." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014) (internal quotation marks omitted). And this is particularly true in construing the FHA, given that the Supreme Court has already instructed that the FHA's "overriding societal priority" of eradicating discrimination in housing does not mean that Congress abandoned traditional tort liability rules to further this goal. *Meyer v. Holley*, 537 U.S. 280, 290–91 (2003). In sum, because "no legislation

15

pursues its purposes at all costs," *Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1073 (2018) (quoting *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 637 (2012)), the debate over the FHA's meaning must take place primarily on the terrain of statutory text—where the majority's expansive holding finds no support.

## 2. *Precedent*

Nor is support for the majority's newfound theory of liability to be found in the precedent of our Circuit and our sister circuits. If the claim at issue here were really discernible from the statute's text, we would expect a substantial body of decisions grappling with the question of landlord liability for tenant-on-tenant harassment. *See* Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 80–81 (2012) ("New rights cannot be suddenly 'discovered' years later in a document, unless everyone affected by the document had somehow overlooked an applicable provision that was there all along."). But as the court below noted, the case law on this question is remarkably "sparse." *Francis*, 91 F. Supp. 3d at 429. Surveying the first thirty years following Title VIII's enactment, I can find no case from any circuit or district court cognizing the claim recognized

16

by the majority today; only a handful consider it in the following two decades.[8]

Even "sparse," it appears, is an understatement.

Previously, the closest cases on point recognized "hostile housing environment claims."  Under this theory of liability, plaintiffs have been permitted to move forward with claims under the FHA where a *landlord's* "offensive behavior unreasonably interfere[d] with use and enjoyment of the premises." *Honce v. Vigil*, 1 F.3d 1085, 1090 (10th Cir. 1993).  We have assumed without deciding (and without publishing) that a plaintiff may state such a claim in appropriate circumstances.  *Khalil v. Farash Corp.*, 277 F. App'x 81, 84 (2d Cir. 2008).  In all the cases from other circuits where these claims have been brought against landlords, however, the landlord *or one of his agents* was responsible for the actual harassment.  *See, e.g.*, *Quigley v. Winter*, 598 F.3d 938, 946–47 (8th Cir. 2010)

---

[8] While at least one district court decision, in more recent years, can be read to support such a claim, *see Fahnbulleh v. GFZ Realty, LLC*, 795 F. Supp. 2d 360, 364 (D. Md. 2011) ("[T]here is no categorical rule that prevents FHA recovery for hostile-housing-environment sexual harassment based on tenant-on-tenant harassment."), a number of courts have held to the contrary, *see, e.g.*, *Lawrence v. Courtyards at Deerwood Ass'n, Inc.*, 318 F. Supp. 2d 1133, 1144–45 (S.D. Fla. 2004) (concluding that "[a] failure to act does not rise to the level of the egregious overt conduct that has been held sufficient to state a claim under section 3617"); *see also Ohio Civ. Rights Comm'n v. Akron Metro. Hous. Auth.*, 892 N.E.2d 415, 419 (Ohio 2008) (holding that a landlord's failure to intervene does not state a claim under Ohio's analogue to the FHA).

17

(affirming jury's determination that landlord violated FHA where the evidence indicated that he sexually harassed a tenant when receiving rent payments).

As precedent for imposing an affirmative obligation on landlords to redress tenant-on-tenant harassment, the majority and HUD point us to *Neudecker v. Boisclair Corp.*, 351 F.3d 361 (8th Cir. 2003) (per curiam). Even assuming that *Neudecker* has *any* persuasive value, *see Halprin*, 388 F.3d at 329 (noting that *Neudecker* was not a "considered holding"), the case is simply inapposite. In *Neudecker*, the complaint alleged that the property manager's children had harassed the disabled plaintiff-tenant, while the property managers themselves disseminated the tenant's private medical information to other tenants and engaged in acts of harassment. *Neudecker*, 351 F.3d at 362–63. As these allegations indicate, the landlord's agents and their children, for whom the landlord might reasonably be held vicariously liable, were thus charged with creating the hostile environment.

The majority also points to the Seventh Circuit's recent opinion in *Wetzel*, but that case, involving the alleged harassment on protected grounds of a senior citizen living in a senior facility, is likewise distinguishable. To be clear, *Wetzel* does hold that the FHA "creates liability against a landlord that has actual notice

18

of tenant-on-tenant harassment based on a protected status, yet chooses not to take any reasonable steps within its control to stop that harassment." *Wetzel*, 901 F.3d at 859. In concluding that such control was adequately alleged, however, the court pointed to the "Tenant's Agreement" governing the defendant's "residential community for older adults." *Id.* This agreement guaranteed residents, *inter alia,* the provision of three meals daily served in a central location and access to a community room. *Id.* The defendant-landlord there was alleged not only to have failed to remediate harassment of the plaintiff by other residents, but also to have barred her from common spaces that she was entitled to frequent. *Id.* at 860. Under these circumstances, the plaintiff may have sufficiently alleged that the landlord "discriminate[d] . . . in the provision of *services or facilities*," *see* 42 U.S.C. § 3604(b) (emphasis added), that had been guaranteed in the rental arrangement. *Wetzel*, 901 F.3d at 867.

To the extent that *Wetzel* reads more broadly to align with the majority's opinion here, it is similarly unpersuasive. *Wetzel* acknowledges that the FHA "does not address" the question of landlord liability for third-party harassment, and that the statute "does not spell out a test" for liability under these circumstances. *Id*. at 863. These concessions support my view: the statute does

not "address" a distinct duty on the part of the landlord to redress harassment because the statute does not impose one. And it would be peculiar for the statute to spell out a "test" for a theory of liability found nowhere within its text. But even assuming *arguendo* that *Wetzel* was correctly decided, it is sufficiently distinguishable from the present case as to provide little, if any, support for the majority's conclusion that an FHA claim has been adequately alleged here.

3. *The Title VII Analogy and the HUD Rule*

At bottom, the majority's conclusion today rests on neither the FHA's text nor its precedent, but on drawing an analogy to Title VII and its "hostile work environment" cases, as recently endorsed by HUD. To prevail on a hostile work environment claim under Title VII, a plaintiff need not demonstrate that the employer himself engaged in the alleged harassment nor offer evidence of discriminatory intent on the employer's part. Instead, a negligent employer can be liable "when a co-worker harasses the plaintiff." *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013). Relying heavily on the 2016 HUD Rule promulgated after this litigation began, the majority becomes the first court to import into the FHA context a theory of liability lifted directly from Title VII case law.

20

The majority "distill[s] from the [HUD] Rule"—not, I will note, the FHA—three elements a plaintiff must prove to establish a housing provider's liability for third-party harassment: "'(1) [t]he third-party created a hostile environment for the plaintiff . . . ; (2) the housing provider knew or should have known about the conduct creating the hostile environment;' and (3) notwithstanding its obligation under the FHA[,] . . . 'the housing provider failed to take prompt action to correct and end the harassment while having the power to do so.'" Maj. Op. at 21 (quoting HUD Rule, 81 Fed. Reg. 63,069). The majority affords "great" weight to the HUD Rule, Maj. Op. at 19, and asserts that while "the analogy between the employer-employee relationship and the landlord-tenant relationship is imperfect," it would nevertheless be "strange indeed" if the FHA did not mirror Title VII in imposing liability on landlords for tenant-on-tenant harassment, just as employers are responsible for the harassing conduct of their employees, Maj. Op. at 13.

Far from bolstering the majority's analysis, however, the analogy to Title VII highlights the glaring problems inherent in its theory of FHA liability. To be sure, Title VII can be *relevant* to the interpretation of Title VIII. But we do not reflexively superimpose one body of case law onto the other. At times, the Supreme Court has emphasized the similarities between the two statutes, *see ICP*, 135 S. Ct. at 2516

21

(interpreting Title VIII with reference to Title VII), but at other moments it has focused on their differences, *see Curtis v. Loether*, 415 U.S. 189, 197 (1974) (rejecting reasoning by analogy to Title VII in interpreting Title VIII). When making the interpretive choice whether to draw an analogy to Title VII, we must keep in mind that which HUD itself concedes: "[T]he home and the workplace are significantly different environments such that strict reliance on Title VII case law is not always appropriate [in the Title VIII context]." HUD Rule, 81 Fed. Reg. 63,055; *see also Wetzel*, 901 F.3d at 866 (acknowledging that "there are salient differences between Title VII and the FHA").

Given that "strict reliance on Title VII case law is not always appropriate," the majority would do well to consider why the analogy it draws between the employer-employee and landlord-tenant relationships makes no sense in the circumstances of this case. First, as the court below aptly noted, there are "well-known legal distinctions between the employer-employee relationship and the landlord-tenant relationship—including, that an employee is considered an agent of the employer while the tenant is not considered an agent of the landlord." *Francis*, 91 F. Supp. 3d at 429; *see also Ohio Civ. Rights Comm'n v. Akron Metro Hous. Auth.*, 892 N.E.2d 415, 420 (Ohio 2008) ("[T]he amount of control that a landlord

22

exercises over his tenant is not comparable to that which an employer exercises over his employee.").  This difference alone urges caution in endorsing today's full-scale incorporation of the precise claim recognized in the employment context, given that the Supreme Court consistently looks to "agency principles for guidance" in setting Title VII liability standards.  *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986).

Granted, the absence of a principal-agent relationship in the landlord-tenant context may not be dispositive on the issue whether a Title VII analogy can be drawn.  Though less common, an employer can sometimes be liable for failing to address a hostile work environment that is created by a non-agent (a non-employee).  *See, e.g.*, *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (noting that university-employer could potentially be liable for failing to redress discrimination perpetrated by student athletes).  Even in these Title VII cases, however, we consider whether "there is a 'specific basis for imputing the conduct creating the hostile work environment to the employer.'"  *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (quoting *Feingold v. New York*, 366 F.3d 138, 149–50 (2d Cir. 2004)).  In doing so, we "consider *the extent of the employer's control* and any other legal responsibility which the employer may have with respect to the conduct of

23

such non-employees." *Summa*, 708 F.3d at 124 (emphasis added) (quoting 29 C.F.R. § 1604.11(e)). In other words, the degree of control enjoyed by the employer remains critical in deducing whether that employer is properly held accountable, should the environment become "hostile."

Employers simply exert far more control over not only their employees, but also the entire workplace environment, than do landlords over their tenants and the residences those tenants quite literally call their own.[9] Taken collectively, an employer's ability to monitor, respond and enforce—all crucial aspects of our Title VII jurisprudence—differs substantially from the ability of a landlord to do the same. For example, in assessing whether an employer was negligent in permitting a hostile work environment to exist, we consider, among other factors, whether the employer adequately "monitor[ed] the workplace, . . . respond[ed] to complaints, . . . provide[d] a system for registering complaints," or, by contrast, "effectively discourage[d] complaints from being filed." *Vance*, 570 U.S. at 449.

---

[9] This observation also applies to the Seventh Circuit's analogy between Title IX (governing discrimination in educational environments) and the FHA. *See Wetzel*, 901 F.3d at 863–64. Our Circuit has suggested that at least some school officials exercise similar control over their students as employers do over employees. *See Summa*, 708 F.3d at 124 (holding that football coach exercised sufficient control over players to impute liability, under Title VII, for harassment of graduate-student manager). The same cannot be said for landlords and their tenants.

24

But as a matter of societal reality, landlords have never monitored their tenants to the substantial degree that employers monitor employees, nor have they solicited and maintained information about tenants and their comings and goings in a similar fashion. Moreover, and significantly, Title VIII contains no evidence of a congressional intent to dramatically upend that reality.

Likewise, the remedial steps we call upon employers to take in the employment setting have no analogue in the housing setting. In the Title VII context, we assess whether an employer "knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Duch*, 588 F.3d at 762 (quoting *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000)). Such "appropriate remedial action" can include launching a "prompt investigation," *Russell v. New York Univ.*, No. 15-cv-2185 (GHW), 2017 WL 3049534, at *29 (S.D.N.Y. July 17, 2017), ordering all staff members to "undergo sexual harassment training," *Summa*, 708 F.3d at 125, or separating the victim from the harasser, *Ingram v. West*, 70 F. Supp. 2d 1033, 1037 (W.D. Mo. 1999). Investigations in this context are a substantial undertaking. An inquiry that amounts "to nothing more than the company's interview of Plaintiff, and the union's telephone conversation with [the harasser]" will not suffice. *Holt*

25

*v. Dynaserv Indus., Inc.*, No. 14-cv-8299 (LGS), 2016 WL 5108205, at *9 (S.D.N.Y. Sept. 19, 2016).  But a thorough investigation that includes interviewing "twelve managers and staff" will.  *Killis v. Cabela's Retail II, Inc.*, No. 13 C 6532, 2015 WL 128098, at *13 (N.D. Ill. Jan. 8, 2015).

As this laundry list of corrective actions indicates, just as landlords do not have the same capacity as employers to monitor their tenants, neither do they ordinarily have similar tools at their disposal to investigate and remediate misconduct.  A landlord cannot temporarily evict a tenant or force all tenants to undergo harassment training and provide information about each other's behavior.  And while an employer can transfer a problematic employee, a landlord cannot move tenants around different building units in similar fashion. Furthermore, even if landlords *could* develop a roster of such intermediate steps and penalties, we might question whether Congress sought to import such a system into the housing context, without a word as to the due process principles that such a system might implicate.

The majority ignores these concerns by asserting that landlords control residential complexes, just as employers control workplaces, because landlords retain the power to evict tenants.  *See* Maj. Op. at 24.  Granted, the majority pays

lip service to the notion that determining whether any particular landlord has sufficient control over tenant behavior to impose liability will be a "fact-dependent inquiry." Maj. Op. at 23. But it concludes by suggesting, again with reference to the HUD Rule, that "housing providers ordinarily have a range of mechanisms at their disposal to correct discriminatory tenant-on-tenant harassment, such as 'issuing and enforcing notices to quit, *issuing threats of eviction and, if necessary enforcing evictions,*' all of which are 'powerful tools.'" Maj. Op. at 24 (quoting HUD Rule, 81 Fed. Reg. 63,071) (emphasis added). In other words, while the majority's liability rule may ostensibly require a "fact-dependent inquiry," the landlord, by virtue of the power to evict, will "ordinarily" lose. But this result, upon analysis, only further underscores the inaptness of the Title VII analogy.

4. *Background Tort Principles and the FHA*

The majority fundamentally errs in its assessment of the present cause of action by failing to consider the Supreme Court's instruction that "an action brought for compensation by a victim of housing discrimination is, in effect, a tort action." *Meyer*, 537 U.S. at 285. Given that directive, it is appropriate to consider traditional "tort-related . . . liability rules," as the Supreme Court does, in

27

interpreting the FHA. *Id.*[10] But the majority has a real problem in taking such rules into account. Courts in general and New York courts in particular have been remarkably clear: "'[A] reasonable opportunity or effective means to control a third person does not arise from the mere power to evict' that person as a tenant." *Torre v. Paul A. Burke Constr., Inc.*, 661 N.Y.S.2d 145, 146 (4th Dep't 1997) (quoting *Siino v. Reices*, 628 N.Y.S.2d 757, 758 (2d Dep't 1995)). Hence, a landlord has no duty to protect a tenant from even the criminal act of another "since it cannot be said that the landlord had the ability or a reasonable opportunity to control [the offending tenant]." *Blatt v. N.Y.C. Hous. Auth.*, 506 N.Y.S.2d 877, 879 (2d Dep't 1986); *see also id.* ("The power to evict cannot be said to have furnished the [defendant] with a reasonable opportunity or effective means to prevent or remedy [the] unacceptable conduct, since the incident giving rise to the injuries

---

[10] There are other potential common law doctrines relevant to a landlord's responsibility for the behavior of third parties, but those sound in contract and property law rather than tort, and generally involve remedies like rent abatement rather than compensatory damages. *See, e.g., Park West Mgmt. Corp. v. Mitchell*, 47 N.Y.2d 316, 329 (1979) (concluding that a janitorial strike violated the implied warranty of habitability). They are thus less pertinent here, given the Supreme Court's conclusion that in the FHA, Congress "legislate[d] against a legal background of ordinary *tort-related* vicarious liability rules and consequently intends its legislation to incorporate *those rules*." *Meyer*, 537 U.S. at 285 (emphases added).

sustained, and indeed, the pattern of harassment alleged by the plaintiff, arose from a purely personal dispute between the two individuals." (internal quotation marks omitted)).[11]

Acknowledging that "the text of the FHA nowhere explicitly endorses landlord liability for tenant-on-tenant harassment," Maj. Op. at 18, the majority nonetheless interprets this text (just recognized to be silent on the issue) to alter rather than respect these traditional tort liability rules. But this analytical move contravenes a cardinal tenet of statutory interpretation that "[i]n order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1993) (citation omitted). We "assume Congress is familiar with the common-law rule

---

[11] To support its contrary position, the majority cites *Firpi v. N.Y.C. Hous. Auth.*, 573 N.Y.S.2d 704 (2d Dep't 1991), but *Firpi*, in fact, demonstrates that Francis's claim has no basis in the common law of New York. The *Firpi* plaintiffs brought a negligence suit against their landlord after one of them was attacked by a co-tenant with whom the plaintiffs allegedly had a "history of disputes." *Id.* at 705. The aggressor had allegedly been the subject of several complaints brought to the landlord not only by the plaintiffs but also by other tenants in the building. *Id.* The court there ordered the *dismissal* of the plaintiffs' negligence claim because the landlord was "not in a position to control [the tenant's] behavior." *Id.* Moreover, the court cautioned that resorting to eviction in this case would not have been "proper in a personal dispute between tenants." *Id.* (citing *Blatt*, 506 N.Y.S.2d at 877). There (as here), the "controversy was one for the police, and not for the [landlord]." *Id.* at 706.

and does not mean to displace it *sub silentio* in federal causes of action. A claim for damages under the FHA—which is akin to a 'tort action'—is no exception to this traditional requirement." *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1305 (2017) (internal quotation marks and citation omitted).

Even if we were to import the Title VII "hostile work environment" standard into the context of the FHA in some circumstances, this common law background suggests the need for a far more careful delineation of the situations in which a landlord exercises sufficient control over tenant behavior to be directly liable for failing to redress that behavior. Perhaps the degree of control exercised by a landlord in cases such as *Wetzel*, where the landlord was responsible for the provision of daily meals and the maintenance of community spaces in a senior living facility, differs in kind from the typical case. Perhaps not. The allegations in the present complaint, however, at least as they relate to the landlord-tenant relationship, are typical in all respects. And as New York courts have confirmed, the power to evict is too blunt and unwieldy an instrument to support the conclusion that landlords are in a position to prevent one tenant's harassment of another, so that liability for the failure to do so may properly be imposed.

\*            \*            \*

30

The instant complaint provides a good example of the difficult questions that go unaddressed in the majority's rush to recognize this new cause of action. According to its allegations, the plaintiff, having already notified the police of his neighbor's outrageous conduct, did not notify the management company of the harassment until almost three months after the first incident occurred and two months after the plaintiff renewed his lease. Moreover, he did not request the company's assistance even at that time. Nor does the complaint suggest that the police investigation had been discontinued or was ineffective. So when, precisely, did the landlord stand in breach of a duty to act, even assuming such a duty existed? Notably, the management company declined to renew the harassing tenant's lease when it came up for renewal in the aftermath of his bad behavior, which by that point had resulted in his arrest. Does failure to renew a lease constitute "prompt" remedial action? Courts will be grappling with such questions for years to come.

The majority dismisses such concerns offhand as a "parade of horribles." Maj. Op. at 21. Make no mistake, however: these issues will be unavoidable for those whom this decision affects. Judge Posner was correct in noting that Congress did not contemplate the problem of harassment by "neighbors" when it

enacted the FHA and that if it had addressed this problem, the most "careful drafting" would have been required. *Halprin,* 388 F.3d at 329. The majority is not in the position to undertake such drafting, but the costs of the legal uncertainty engendered by its decision cannot be wished away. Today's decision may benefit law firms and insurance companies, which sometimes profit from legal anomalies. *See* 42 U.S.C. § 3613(c)(2) (attorney's fees accorded to the prevailing party at the discretion of the court). Despite the majority's good intentions, however, the real winners today will not include those in pursuit of fair housing, and certainly not the renters among them, who will likely be left to foot the bill.

II

Having applied the "ordinary tools of statutory construction," *City of Arlington v. F.C.C.,* 569 U.S. 290, 296 (2013), I conclude by considering more closely HUD's guidance on the question at issue here. As referenced above, after this litigation commenced, HUD promulgated a regulation through the notice-and-comment process that imports the scope of employer liability under Title VII for employee-on-employee harassment into the housing context and purports to cognize the precise claim the majority recognizes today. *See* HUD

Rule, 81 Fed. Reg. 63,054.[12]  HUD also submitted an *amicus* brief offering essentially

the same argument as set forth in the preamble to and comments surrounding its

new rule.  *See generally* HUD Amicus Br.

The Seventh Circuit declined to rely on the HUD Rule in *Wetzel*, noting that

"there are salient differences between Title VII and the FHA" and that "more

analysis than HUD was able to offer" was needed to support HUD's position.

*Wetzel*, 901 F.3d at 866.  The majority evinces no such caution, purporting to use

the Rule merely to "reinforce" its view, Maj. Op. at 20, but at the same time

---

[12] 24 C.F.R. § 100.7, "Liability for Discriminatory Housing Practices," reads:

(a) *Direct liability.*

(1) A person is directly liable for:

> (i)  The person's own conduct that results in a discriminatory housing practice.
>
> (ii)  Failing to take prompt action to correct and end a discriminatory housing practice by that person's employee or agent, where the person knew or should have known of the discriminatory conduct.
>
> (iii)  Failing to take prompt action to correct and end a discriminatory housing practice by a third-party, where the person knew or should have known of the discriminatory conduct and had the power to correct it. The power to take prompt action to correct and end a discriminatory housing practice by a third-party depends upon the extent of the person's control or any other legal responsibility the person may have with respect to the conduct of such third-party.

according it "great," albeit "by no means definitive" weight, Maj. Op. at 19, and devoting the majority of its discussion to that Rule. I disagree with the majority's effectively dispositive reliance on HUD's pronouncements, which fail adequately to justify the agency's interpretation of the text and, in any event, raise retroactivity concerns if applied in this case.

First, even assuming *arguendo* the majority's erroneous premise that the HUD Rule is "interpretive," Maj. Op. at 25, the Rule carries little to no persuasive force. The "convenience [of interpretive rules] comes at a price: Interpretive rules do not have the force and effect of law and are not accorded that weight in the adjudicatory process." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203–04 (2015) (internal quotation marks omitted).[13] The deference afforded to an interpretive rule "depends on, *inter alia*, 'the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements.'" *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 509 (2d Cir. 2017) (quoting *Skidmore v. Swift*, 323 U.S. 134, 140 (1944)).

---

[13] So, too, for HUD's *amicus* brief, even applying this Circuit's precedent, which extends *Skidmore* deference to an agency's interpretation of a statute set forth during litigation. *See SEC v. Rosenthal*, 650 F.3d 156, 160 (2d Cir. 2011). The Supreme Court has not yet addressed the propriety of deference in such circumstances, and "there is a well-defined circuit split on the question." *E.I. Du Pont De Nemours & Co. v. Smiley*, 138 S. Ct. 2563 (2018) (Gorsuch, *J.*, dissenting from the denial of *certiorari*).

The HUD Rule scores poorly on all these metrics. For the reasons already explained at length, the Rule misinterprets the FHA's text, finds no support in precedent, and relies on a flawed analogy to Title VII. The Supreme Court has already rejected similarly superficial reasoning by analogy in the Title VII context, denying *Skidmore* deference to an interpretation by the Equal Employment Opportunity Commission that merely referenced the case law surrounding *other* antidiscrimination statutes and "fail[ed] to address the specific provisions of [Title VII's] statutory scheme." *Nassar*, 570 U.S. at 361. Furthermore, HUD's responses to the comments provided during the notice-and-comment period are circular and conclusory. For example, in response to commentator concerns that the Rule "unduly burden[s] housing providers," HUD merely asserts that the regulation "does not create new or enhanced liabilities." *See* HUD Rule, 81 Fed. Reg. 63,069. Yet the Rule undeniably paves the way for a new category of FHA litigation, and thus *some* analysis of its effects was warranted. *See Wetzel*, 901 F.3d at 866 (rejecting wholesale adoption of the HUD Rule as a theory of liability under the FHA because "more analysis than HUD was able to offer is necessary before we can take that step").

But the majority's reliance on the HUD Rule is also impermissible for an entirely different reason: the Rule is *legislative*, and so cannot have the retroactive effect on this case that the majority affords it. Interpretive rules "do not create rights, but merely clarify an existing statute or regulation," while "legislative rules are those that create new law, rights, or duties, in what amounts to a legislative act." *Sweet v. Sheahan*, 235 F.3d 80, 91 (2d Cir. 2000) (internal quotation marks omitted). This Rule clearly does the latter. HUD's claims to the contrary notwithstanding, the prior interpretations of the FHA canvassed throughout this dissent demonstrate that HUD's rule "significantly expand[s] the class of persons" subject to a legal requirement, *id*. at 92, by creating a new form of liability for an entire class of housing providers. Even within HUD's own proceedings, I can find no precedent for the interpretation advanced under the current iteration of the Rule. *See, e.g., The Sec'y, United States Dep't of Hous. & Urban Dev., on Behalf of Christina L. Brown, Charging Party*, 1997 WL 358074, at *5 (H.U.D. June 26, 1997) ("[I]n order to establish a hostile environment in a case brought under the [FHA], *the actions of the landlord* must be pervasive and persistent." (emphasis added)). In other words, if the regulation represents HUD's own "longstanding view," Maj. Op. at 26, it is one that has, for just as long, been hidden from sight.

Giving retroactive effect to a legislative rule "presents problems of unfairness because it can deprive [parties] of legitimate expectations and upset settled transactions." *Sweet*, 235 F.3d at 88 (quoting *Eastern Enters. v. Apfel*, 524 U.S. 498, 501 (1998)). In the absence of a clear congressional signal, "[w]e are prohibited from applying a regulation to conduct that took place before its enactment . . . where the regulation would 'impose new duties with respect to transactions already completed.'" *Rock of Ages Corp. v. Sec'y of Labor*, 170 F.3d 148, 158 (2d Cir. 1999) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)). Given that the HUD Rule "create[s] new law, rights, or duties, in what amounts to a legislative act," *Sweet*, 235 F.3d at 91 (internal quotation marks omitted), it cannot apply to this case.

Lacking any persuasive agency guidance, "[i]t is instead our task to determine the correct reading" of the FHA. *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015). I believe I have done so. For all of the reasons outlined above, I respectfully dissent from the majority's decision to vacate the dismissal of the plaintiff's FHA claims, as well as his claims pursuant to the New York State Human Rights Law, which parallels the FHA.

*          *          *

Finally, I dissent as well from the vacatur of the district court's dismissal of Francis's claims pursuant to §§ 1981 and 1982. In a single paragraph, the majority contends that a plaintiff need only allege that a defendant was "deliberate[ly] indifferen[t]" to racial discrimination in order to state the intent element of claims pursuant to these provisions. Maj. Op. at 31. Even assuming *arguendo* the majority's questionable conclusion that a deliberate indifference standard governs Francis's §§ 1981 and 1982 claims, I would hold that Francis has failed plausibly to allege his landlord's deliberate indifference. *See Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 (2d Cir. 1999) ("[A] plaintiff must show that the defendant's indifference was such that the defendant *intended the discrimination to occur*." (emphasis added)). But in any event, the problems with the majority's *ipse dixit* indifference standard run deeper.

The Supreme Court has never held, as the majority purports to do today, that allegations of deliberate indifference are sufficient to make out the intent element of §§ 1981 and 1982 claims. Moreover, before today, this Court had affirmed the propriety of the "deliberate indifference" standard in the § 1981 context only, specifically in the school setting. *See Gant*, 195 F.3d at 141. Our precedent in *Gant* relied on Supreme Court decisions construing Title IX. *See id.* at

38

140 (citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642–43 (1999)). The Supreme Court, for its part, found the application of the "deliberate indifference" standard appropriate in the Title IX context only because of school officials' "substantial *control* over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645 (emphasis added). A Title IX funding recipient's liability for deliberate indifference to racial harassment therefore arises *only* where the official "at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

The majority here substantially broadens the scope of liability pursuant to §§ 1981 and 1982 by unmooring the less demanding "deliberate indifference" standard from the Supreme Court's "limit[ing]" factors, *Davis*, 526 U.S. at 645, thus exposing all manner of private actors to suit for the acts of third parties. Respectfully, however, the majority's conclusion here is no more the product of reasoned explication than is the analogy it draws between landlords and employers. Accordingly, I also dissent as to the majority's decision to reinstate Francis's claims under §§ 1981 and 1982, and would affirm the judgment in all respects.